# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN KEITH WALTERS,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No. 1:17-cv-00778-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 17, 18, 19) |

## I.

## INTRODUCTION

Plaintiff John Keith Walters ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for a period of disability, disability benefits, and supplemental security income pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from lumbar degenerative disc disease, arthritis, obesity, and status post right wrist necrosis and three internal fixation surgeries. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

/ / /

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 9, 10.)

1

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 1, 2013, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II ("Title II claim") and an application for supplemental security income under Title XVI ("Title XVI claim") alleging disability beginning September 15, 2005. (AR 251-270.) Plaintiff's applications were initially denied on September 13, 2013, and on reconsideration on January 29, 2014. (AR 131-141, 144-155.) Plaintiff requested and received a hearing before Administrative Law Judge Vincent Misenti ("the ALJ"). Plaintiff appeared for a hearing on August 27, 2015, but the hearing was postponed because Plaintiff wanted to retain a representative. (AR 60-69.) Plaintiff then appeared with his representative for a hearing on December 28, 2015. (AR 28-59.) On February 1, 2016, the ALJ found that Plaintiff was not disabled. (AR 9-21.) The Appeals Council denied Plaintiff's request for review on April 6, 2017. (AR 1-4.)

### A. Relevant Hearing Testimony

Plaintiff testified at the hearing on December 28, 2015. He lives with his mother. (AR 33-34.) He has a driver's license and he drives twice a week. (AR 34.) In fact, he drove to the hearing. (AR 34.) He graduated from high school. (AR 34.) He has not worked after September 15, 2005. (AR 34.)

He filed a previous application in 2006, but was told that he could not get Social Security because he had a 401k. (AR 35.) After that time, he did not have insurance, so he was not going to a doctor except for a small clinic where he would get medications. (AR 35.)

He is alleging disability because of back pain and a right wrist condition. (AR 35.) Diabetes does not limit his ability to work. (AR 36.) He has been diagnosed with and received treatment for depression and anxiety. (AR 36.) The biggest reason that he cannot work is his lower back. (AR 36.) His back pain started gradually, but he also injured it in approximately 2004 when he was hit in the lower back with scaffolding while working in a mobile home. (AR 36-37.) His back condition has gotten worse over the past 5 years. (AR 39.) A doctor recently diagnosed his back condition. (AR 37.)

He injured his right wrist in 1993 when he tore a scapholunate ligament. (AR 40.) It was reattached with wire and suture anchors. (AR 40.) He was told at that time that he would eventually need a wrist fusion. (AR 42.) He subsequently had two other surgeries on his right wrist. (AR 40-41.) He had one De Quervain's release in 1994 and a second in 1999. (AR 41.)

His right wrist hurt at times, but he was taking care of it by icing every night. (AR 42.) He hurt his wrist again about a year prior to the hearing. (AR 41.) He hit the same place as the previous injury and the x-ray revealed necrotic bone. (AR 41.) The only treatment for the necrotic bone is to remove the bone and do a total wrist fusion. (AR 41.) Sierra Orthopedic wanted to wait on the fusion until Plaintiff's thumb healed. (AR 41.) He broke his right thumb pretty bad and knocked the nail loose, which then became infected. (AR 41.) The doctor wanted to wait six months to decide whether to do the fusion. (AR 41-42.) Plaintiff thinks the infection in the right thumb is gone, but it still hurts and he does not have full movement or strength in it. (AR 42.) He does not wear any braces or splints. (AR 44.) His right wrist is fatigued and it is not as strong as it used to be. (AR 44.)

Plaintiff's medical treatment from 2005 through 2010 consisted of medication from a clinic called Family Healthcare Network. (AR 37-38.) He took medication twice a day for the pain in his lower back and hip that would radiate down his leg. (AR 38.) The medication dulled the pain. (AR 38.) He attended physical therapy in 2006. (AR 38.) He received 4 epidural shots, but they did not help. (AR 39.) No one has discussed surgery with Plaintiff. (AR 38.) He has not used an assistive device to ambulate and has not been hospitalized. (AR 39.)

Between 2005 and 2010, his ability to bend, sit, and stand was limited. (AR 49.) During that time, he could only stand and walk for a couple hours during the day because of hip and leg pain. (AR 49.) The pain medication somewhat helped, but it never took the pain away. (AR 49-50.) Laying down helped the pain, so he laid down 2 to 3 times a day for 30 minutes to an hour. (AR 50.)

He has had Medi-Cal for about a year and a half and he has been seeing doctors more often than prior to getting Medi-Cal. (AR 39-40.) He has been going to Living Water Clinic where he sees Dr. Madrigal twice a month. (AR 40, 48-49, 53.) The only treatment that he receives is

medication. (AR 40.) He takes Naproxen daily. (AR 40.) He has been experiencing lethargy, blurry vision, and severe constipation as a side effect of medication since 2005. (AR 49, 52.)

He worked as a home remodeling carpenter from April 2001 through September 2005 and he was able to work "quite a few years" as a carpenter despite the wrist injury. (AR 42.) When he worked as a carpenter, he used a hammer, nail gun, and saws. (AR 43.) The last 3 months that he worked, he worked part-time. (AR 48.) Sometimes he would work less than half days and not even the whole week. (AR 48.) He stopped working because the company said that they had to let him go because they could not justify the cost of him being there. (AR 48.)

Prior to that job, he did tree work using a chainsaw, but that was for less than a year because his wrist hurt from using a chainsaw. (AR 42-44.) He also worked as a dispatcher at Fields, Stone, and Associates in 1998 and 1999 and then the company became Fleet Transport, where he worked from November 1999 through March 2001. (AR 55-56.)

He can sit for an hour, stand for 15 minutes, and walk a couple hundred yards. (AR 44-45.) He can lift 20 lbs. (AR 45.) He can sit for a total of 2 to 3 hours and stand for the same amount in an 8-hour workday. (AR 50-51.) The rest of the 8-hour workday would be spent laying down or at least reclining. (AR 51.) He lays down for about 2 hours twice a day and for a longer period when he goes out during the day. (AR 50.)

He cooks and takes out the trash daily, does housecleaning once a week, and mows the lawn occasionally. (AR 45.) He does grocery shopping, including shopping for his mother, and laundry. (AR 45-47.) He has to rest for about a half hour after cooking for an hour or doing other chores. (AR 51.) It takes him all day to vacuum. (AR 51.) He helps his mother who weighs 150 lbs. get in and out of bed and get in and out of her wheelchair. (AR 45-46.) He also loads the wheelchair into the car and unloads it from the car. (AR 46.) He has not been anywhere since Memorial Day weekend. (AR 47.) When he drives twice a week, it is usually around Porterville or Lindsay. (AR 52.)

Vocational Expert ("VE") Judith L. Najarian also testified at the hearing. (AR 53-59.) The VE testified that Plaintiff had prior work as a truck dispatcher, DOT # 249.167-014, sedentary,

and SVP 5, and it was performed at light. (AR 54-55.)[2] The VE testified that an individual with Plaintiff's RFC could do the dispatcher job as the DOT has it and as Plaintiff performed it. (AR 56.)

The VE also testified that an individual with Plaintiff's RFC who was in the 3 age categories that Plaintiff was during this case could be a patient transporter, DOT # 355.677-014, medium, and SVP 2, and there are 54,335 jobs nationally. (AR 57.) Another job that the individual could perform is stubber, DOT # 222.687-032, medium, and SVP 2, and there are 34,675 jobs nationally. (AR 57.) The VE's testimony was consistent with the DOT. (AR 58.)

**B. ALJ Findings**

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2010.
- Plaintiff has not engaged in substantial gainful activity since September 15, 2005, the alleged onset date.
- Plaintiff has the following severe impairments: lumbar degenerative disc disease, arthritis, obesity, and status post right wrist necrosis and three internal fixation surgeries.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.
- After careful consideration of the entire record, Plaintiff has the residual functional capacity ("RFC") to lift and carry 50 lbs. occasionally and 25 lbs. frequently, stand and walk 6 hours, sit 6 hours, occasionally stoop and climb ramps and stairs, and frequently balance, kneel, crouch, crawl, and handle with the right hand, but never climb ladders, ropes, or scaffolds.
- Plaintiff is capable of performing past relevant work as a truck dispatcher. This work does not require the performance of work-related activities precluded by the Plaintiff's RFC.
- Plaintiff has not been under a disability, as defined in the Social Security Act, from September 15, 2005, through the date of the decision.

(AR 14-21.)

---

[2] Plaintiff's counsel asserted that the dispatcher job was outside of the 15-year period. (AR 59.)

# III.

# LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

<u>Stout v. Commissioner, Social Sec. Admin.</u>, 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." <u>Hill v. Astrue</u>, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal

quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred by rejecting the opinion of his treating physician, Dr. Erick Madrigal, in favor of the examining and nonexamining physicians. Plaintiff's argument centers around his right wrist limitations. Plaintiff also argues that the ALJ erred by finding that Plaintiff could perform his past relevant work for the Title XVI claim because he did not have substantial earnings during the 15-year period prior to the ALJ's decision.

Defendant counters that the ALJ properly evaluated the medical opinions and substantial evidence supports the RFC. Defendant also asserts that substantial evidence supports the ALJ's finding that the dispatcher job was past relevant work for purposes of his Title XVI claim.

Plaintiff replies that the ALJ should have relied on Dr. Madrigal's opinion because that opinion is the only one in the record that considers how Plaintiff's scaphoid necrosis impacts Plaintiff's ability to engage in manipulative tasks. Plaintiff asserts that remand is necessary to determine whether he can engage in work activity with a limitation to occasional use of his right hand for reaching, handling, and fingering. Plaintiff contends that the step four determination is not supported by substantial evidence.

**A.     The ALJ Did Not Err in Giving No Weight to Dr. Madrigal's Opinion**

Plaintiff argues that the ALJ did not provide specific and legitimate reasons supported by

substantial evidence for giving no weight to Dr. Madrigal's opinion.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general, a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). A treating physician's opinion is entitled to controlling weight on the issue of the nature and severity of the claimant's impairment where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(c).

"If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.' " Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2). "In that event, the ALJ is instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician." Orn, 495 F.3d at 632. The factors to be considered include the " '[l]ength of the treatment relationship and the frequency of examination' by the treating physician, the '[n]ature and extent of the treatment relationship' between the patient and the treating physician, the '[s]upportability' of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole.' " Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)). Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings

that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Id.

The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957. It is the ALJ's responsibility to consider inconsistencies in a physician opinion and resolve any ambiguity. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999). The ALJ can meet her "burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 779 F.2d 1403, 1408 (9th Cir. 1989)).

Here, the ALJ gave no weight to Dr. Madrigal's opinion because Dr. Madrigal only began seeing Plaintiff one year prior to the ALJ's decision and Dr. Madrigal's medical treatment records are not significantly abnormal. (AR 18.) The length of the treatment relationship is a relevant factor for the ALJ to consider, but the fact that Dr. Madrigal only began seeing Plaintiff one year prior to the ALJ's decision is not a specific and legitimate reason itself to reject Dr. Madrigal's opinion as to both the Title II and Title XVI claims. The Court agrees with Defendant that Plaintiff's date last insured was December 31, 2010, and therefore, Plaintiff had to show that he was disabled on or before that date for his Title II claim. See Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998) (citing Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)). The fact that Dr. Madrigal did not start seeing Plaintiff until one year prior to the decision, which is approximately 4 years after the date last insured, could be relevant to the weight given to Dr. Madrigal's opinion for the Title II claim. However, it is not a specific and legitimate reason itself for rejecting the opinion as to the Title II claim.

However, any error is harmless if the remaining the reason the ALJ provided for rejecting Dr. Madrigal's opinion—Dr. Madrigal's medical treatment records are not significantly abnormal—is a specific and legitimate reason supported by substantial evidence. The ALJ need

not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957. A doctor's examination findings can be used to reject that doctor's subsequent opinion. See Johnson, 60 F.3d at 1433.

Dr. Madrigal completed a physical residual capacity medical source statement on December 22, 2015. (AR 698-701.) He indicated that he saw Plaintiff 1-2 times a month starting in December 2014. (AR 698.) He diagnosed Plaintiff with chronic back pain, diabetes, hypertension, hyperlipidemia, obesity, anxiety, depression, insomnia, and necrotic scaphoid bone in right wrist. (AR 698.) No prognosis was given. (AR 698.) Plaintiff's symptoms are chronic wrist, back, hip, and knee pain and intermittent heart palpitations. (AR 698.) When asked to describe Plaintiff's pain, he only described back pain. (AR 698.) He indicated that Plaintiff's impairments, symptoms, and limitations have probably lasted since September 2005, which he wrote is the date Plaintiff claims he could no longer work. (AR 698.)

He found that Plaintiff could rarely lift and carry 10 lbs. and never lift 15 lbs. (AR 698-699.) He indicated that Plaintiff could not walk one city block without rest or severe pain, walk one block on rough or uneven ground, or climb steps without the use of a handrail at a reasonable pace. (AR 699.) Plaintiff does not have problems with balancing when walking, but does have problems stooping, crouching, and bending. (AR 699.) Plaintiff must lie down for 45 minutes at a time because of fatigue and pain and must lie down for 1 hour during an 8-hour workday. (AR 699.) Plaintiff can sit for 3 hours and stand and walk for 3 hours in an 8-hour work day. (AR 699.) Plaintiff will need to take unscheduled breaks, but it is unclear how often this will happen and how long Plaintiff would need to rest before returning to work. (AR 699-700.) For his left hand, Plaintiff can do gross manipulations 50% of the time, fine manipulations 50% of the time, and reaching 10% of the time. (AR 700.) For his right hand, he can only do gross manipulations 20% of the time, fine manipulations 20% of the time, and reaching 10% of the time because of a necrotized scaphoid. (AR 700.) However, Plaintiff could push and pull arm or leg controls for 6 or more hours per 8-hour workday. (AR 700.)

Plaintiff's depression and anxiety affect him. (AR 700.) Plaintiff's pain constantly interferes with the attention and concentration needed to perform simple work tasks. (AR 700.) Plaintiff's

stress will frequently interfere with the attention and concentration needed to perform simple work tasks. (AR 700.) Plaintiff will be off task more than 30% of the 8-hour work day, will miss 3 days a month, will be unable to complete a workday 3 days a month, and will be 70% as efficient as an average worker on a sustained basis. (AR 701.) Plaintiff is unable to obtain and retain work in a competitive work environment on a fulltime basis because he has fluctuating degrees of pain and his limitations can be unpredictable. (AR 701.) Dr. Madrigal's opinion is based on Plaintiff's history and medical file; progress and office notes; and x-rays, CT Scans, or MRIs. (AR 701.)

Plaintiff asserts that Dr. Madrigal's opinion is supported by objective evidence in the record. Plaintiff points to x-ray findings in November 2014 that confirm mild osteopenia, moderate to advanced osteoarthritis of the navicular trapezium of the first metacarpal joints, orthopedic screws over the navicular with deformity consistent with old fracture, and sclerosis with cystic changes in the navicular consistent with avascular necrosis. (AR 603.) While Plaintiff asserts that the necrosis in his right wrist supports Dr. Madrigal's limitation to occasional manipulation at most with the right hand, a diagnosis itself is insufficient to support limitations. As the ALJ pointed out, Dr. Madrigal's treatment notes are not significantly abnormal.

Dr. Madrigal saw Plaintiff for a physical examination on November 12, 2014, during which Plaintiff reported no muscle aches, muscle weakness, arthralgias/joint pain, and no swelling in the extremities. (AR 681.) During the examination, Plaintiff had normal motor strength and tone. (AR 681.) The joints, bones, and muscles had no contractures, malalignment or bony abnormalities and tenderness and limited range of motion. (AR 681.) Dr. Madrigal diagnosed Plaintiff with low back pain, an injury of the wrist which was established and improving, hypertension, diabetes, and hyperlipidemia. (AR 681-682.)

On December 17, 2014, Plaintiff saw Dr. Madrigal for medication refill. (AR 673-677.) Plaintiff stated that he had pain in his lower back, right hip, and right wrist. (AR 675.) He reported muscle aches, arthralgias/joint pain, and back pain, but no muscle weakness and no swelling in the extremities. (AR 675.) During the examination, he had normal motor strength and tone. (AR 675.) The joints, bones, and muscles had no contractures, malalignment or bony abnormalities and tenderness and limited range of motion. (AR 675.) There was no cyanosis or edema in his

extremities. (AR 675.) Dr. Madrigal diagnosed Plaintiff with low back pain, hypertension, diabetes, hyperlipidemia, allergic rhinitis, and obesity. (AR 675-676.)

The next time Plaintiff saw Dr. Madrigal was on February 11, 2015, for a follow-up for his thumb injury. (AR 635-638.) Plaintiff reported pain and issues with his right thumb, but he had no muscle aches, muscle weakness, arthralgias/joint pain, back pain, or swelling in the extremities. (AR 637.) During an examination, Plaintiff had normal motor strength and tone and he had normal movement of all extremities. (AR 637.) There was no cyanosis or edema in his extremities. (AR 637.) Plaintiff was diagnosed with diabetes, hypertension, and cellulitis. (AR 637.)

The next visit Plaintiff had with Dr. Madrigal was on September 25, 2015. (AR 614-617.) This is the final visit with Dr. Madrigal in the record. During this follow-up visit for lab results, Plaintiff did not complain of any wrist pain. (AR 614-617.) During the musculoskeletal examination, Plaintiff had normal movement of all extremities and tenderness. (AR 616.) He had decreased range of motion on extension during the back examination. (AR 616.) Dr. Madrigal diagnosed Plaintiff with hypertension, hyperlipidemia, diabetes, and low back pain. (AR 616.)

Further, when Plaintiff visited the clinic where Dr. Madrigal worked, Living Water Clinic, Plaintiff did not complain of left upper extremity issues and only complained of right upper extremity issues after he hurt himself in November 2014 and January 2015 using a wood splitter. (AR 605-612, 630-661, 670-684.) After he hurt his wrist in November 2014, a doctor recommended antibacterial ointment for the abrasion, ice, and an ace wrap. (AR 682-684.) When Plaintiff injured his thumb in January 2015, doctors removed his thumb nail and he was prescribed medication, and when his thumb became infected, the thumb was drained and he was prescribed antibiotics. (AR 605-612, 630-661, 670-673.) At his visit on February 27, 2015, Plaintiff reported that he was healing well after his post-op visits and he had no muscle weakness, arthralgias/joint pain, or swelling in the extremities. (AR 628.)

In addition, Plaintiff's treatment records prior to his treatment at Living Water Clinic do not reveal complaints of wrist or hand pain. As the ALJ pointed out, while Plaintiff complains of a disabling right wrist impairment following three internal fixation surgeries in the early 1990s, he received little and conservative treatment for his wrist pain. (AR 17.)

While Plaintiff disagrees with the ALJ's interpretation of the evidence, the ALJ is responsible for resolving conflicts in the medical testimony. It is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

Here, the ALJ's interpretation was rational. The Court finds that substantial evidence supports the ALJ's finding that Dr. Madrigal's medical treatment records are not significantly abnormal. Therefore, the Court finds that the ALJ did not err in giving no weight to Dr. Madrigal's opinion because he provided a specific and legitimate reason supported by substantial evidence.

### B. Plaintiff's RFC is Supported by Substantial Evidence

Plaintiff also asserts that the RFC found by the ALJ is not supported by the examining physician and nonexamining physicians' opinions. When formulating Plaintiff's RFC, the ALJ considered the medical opinions and Plaintiff's statements alleging disability as well as other evidence in the record.

First, the Court notes that the ALJ found that Plaintiff's allegations are not fully credible because of inconsistent statements and a significant amount of daily activities. (AR 18-19.) Plaintiff does not specifically challenge this credibility finding, and therefore, the Court does not address it further.

Plaintiff takes issue with the fact that Dr. Raman Verma, the consultative examiner, and Dr. R. Fast and Dr. A Nasrabadi, the state agency reviewing physicians, did not acknowledge or consider that Plaintiff had the severe impairment of right wrist necrosis. However, as discussed above, an impairment or diagnosis itself is not disabling. The question is what functional limitations a claimant has from an impairment or combination of impairments. The fact that these doctors did not know about and did not include in their opinions the diagnosis of right wrist necrosis does not mean that their opinions should be discounted. These doctors had objective findings and other evidence in the record to base their opinions on.

The ALJ gave great weight to Dr. Verma because his opinion is consistent with the objective findings. (AR 18.) The ALJ noted that Dr. Verma's examination of Plaintiff revealed decreased

grip strength in the right hand, but normal ranges of motion and full motor strength in all extremities. (AR 18, 589-590.) While Dr. Verma diagnosed right wrist restrictions that would limit Plaintiff's activities, he found that Plaintiff could lift and carry 50 lbs. occasionally and 25 lbs. frequently and reach without any limitations in all directions. (AR 18, 591-592.) Dr. Verma also noted that a decrease in the range of motion of the right wrist would affect Plaintiff's functional ability. (AR 592.) The Court notes that while the ALJ gave great weight to Dr. Verma's opinion, the RFC is more restrictive than Dr. Verma's opinion for handling with the right hand. The RFC is frequent handling with the right hand. While Plaintiff takes issue with the ALJ giving great weight to Dr. Verma's opinion that he had no handling limitations, the ALJ gave a more restrictive RFC than this part of Dr. Verma's opinion. The RFC is also based on the opinions of the state agency reviewing physicians.

The ALJ gave great weight to Dr. Fast and Dr. Nasrabadi because their opinions are consistent with the medical evidence in the record. (AR 18.) Both Dr. Fast and Dr. Nasrabadi found that Plaintiff could perform medium work with frequent postural activities except occasional stooping, unlimited balancing, and frequent handling on the right. (AR 80-82, 107-109, 120-122.) The frequent handling on right was due to wrist pain and decreased range of motion. (AR 81, 108, 121.)

Here, Dr. Fast and Dr. Nasrabadi considered that Plaintiff had 3 surgeries on his right wrist. They also considered that at the consultative examination with Dr. Verma, Plaintiff had decreased grip strength in his right hand compared to his left and he had decreased range of motion in his right wrist. They looked at the fact that Dr. Verma stated that Plaintiff's wrist problem would affect his functional ability, but he did not provide any manipulative restrictions. Therefore, Dr. Fast and Dr. Nasrabadi considered the few positive findings regarding Plaintiff's right wrist problem (except for findings after an injury using a wood splitter in November 2014) and found the limitation of frequent handling with the right hand.

The ALJ considered that the evidence in the record supports frequent handling with the right hand. The treatment records reveal that Plaintiff only complained of right upper extremity issues after injuries using a wood splitter. (AR 605-612, 630-661, 670-684.) The ALJ also considered

1  that Plaintiff received little and conservative treatment for his wrist pain. (AR 17.) The ALJ
2  considered the opinions of Dr. Verma, Dr. Fast, and Dr. Narabadi, which considered the positive
3  findings during the consultative examination. Relying on these three opinions, the ALJ found that
4  Plaintiff was limited to frequent handling with the right hand. The ALJ's interpretation of the
5  evidence in the record is rational.

Accordingly, the Court finds that substantial evidence supports the ALJ's RFC.

### C. Any Error by the ALJ in Finding that Plaintiff Could Perform His Past Relevant Work as a Truck Dispatcher for the Title XVI Claim is Harmless

Plaintiff asserts that the ALJ erred in determining for the Title XVI claim that Plaintiff could perform his past work as a truck dispatcher. Plaintiff argues that his truck dispatcher job was not substantial gainful activity during the 15-year period for Title XVI claims because he stopped the job in March 2001 and his earnings in February and March 2001 were below the amount required for substantial gainful activity. Defendant contends that earnings alone are not dispositive of whether a plaintiff engaged in substantial gainful activity. Defendant asserts that the ALJ's determination that the truck dispatcher job is substantial gainful activity is supported by the fact that Plaintiff engaged in substantial gainful activity from November 1999 through December 2000 at the same job that Plaintiff performed between January and March 2001. Plaintiff replies that the ALJ did not make these findings in his decision and that Defendant's arguments are not supported by substantial evidence.

"At step four [of the five-step disability determination process], claimants have the burden of showing that they can no longer perform their past relevant work." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520(e) and 416.920(e); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990)). A job is past relevant work if it involved substantial gainful activity. See Lewis v. Apfel, 236 F.3d 503, 515 (9th Cir. 2003). Substantial gainful activity is work done for pay or profit that involves significant mental or physical activities. Id. (citing 20 C.F.R. §§ 404.1571-404.1572 & 416.971-416.975).

Here, the ALJ issued his decision on February 1, 2016. Therefore, work that was performed after February 1, 2001, would qualify as work within the last fifteen years for purposes of the Title

XVI claim. Plaintiff points out that he earned only $1,084.89 in 2001 as a dispatcher for Halsey and Weeks. (AR 273-274.)

Earnings over an amount specified in the guidelines creates a presumption of substantial gainful activity. See Keyes v. Sullivan, 894 F.2d 1053, 1056 (9th Cir. 1990) (citations omitted). In 2001, month earnings of $740 or more created a presumption of substantial gainful activity. 20 C.F.R. § 404.1574(b)(2); https://www.ssa.gov/OACT/COLA/sga.html (last visited April 25, 2018). Monthly earnings below this amount create a presumption that the person did not engage in substantial gainful activity. 20 C.F.R. § 404.1574(b)(3). Plaintiff's monthly earnings for February and March 2001 would fall below the presumptive amount.

The presumption that a person did not engage in substantial gainful activity because of low earnings may be rebutted by substantial evidence that the person has engaged in substantial gainful activity, including evidence regarding the nature of the work, how well the person did the work, whether the work was done under special conditions, whether the person was self-employed, and the amount of time spent working. See Lewis, 236 F.3d at 515-516. Defendant argues that evidence in the record other than earnings shows that Plaintiff could engage in substantial gainful activity during the 15-year period. The ALJ found that the earnings exceeded the minimum required for it to be considered substantial gainful activity. (AR 19.) The ALJ did not discuss, except for earnings, any evidence that could support a determination that Plaintiff engaged in substantial gainful activity during the 15-year period for the Title XVI claim. (AR 19.) While the Court may draw reasonable inferences from the ALJ's opinion, Magallanes, 881 F.2d at 755, it cannot consider Defendant's post hac rationalizations. "A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738 (9th Cir. 1991).

However, as Defendant points out, even if it was error for the ALJ to find that Plaintiff could perform his past relevant work as a truck dispatcher for the Title XVI claim, any error is harmless because the ALJ made an alternative step five finding. The harmless error inquiry is "whether the ALJ's decision remains legally valid, despite such error." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008). If an ALJ's step four determination is erroneous, it

1   is harmless error if the ALJ makes an alternative step five finding that is supported by substantial
2   evidence. See Tommasetti v. Astrue, 533 F.3d 1035, 1042-43 (9th Cir. 2008).

3   Work exists in "significant numbers" if it exists in "significant numbers" either in the region
4   where the individual lives or in several regions throughout the country. 42 U.S.C. § 423(d)(2)(A);
5   Gutierrez v. Comm'r of Soc. Sec. Admin., 740 F.3d 519, 528 (9th Cir. 2014). While the Ninth
6   Circuit has not created a bright-line rule for what constitutes a "significant number" of jobs, it has
7   found that 25,000 jobs nationally is a sufficient number. See Gutierrez, 740 F.3d at 529.

8   Here, the ALJ rendered an alternative step 5 finding that Plaintiff could perform the jobs of
9   patient transporter and stubber based on the VE's testimony. (AR 20-21.) The VE testified that
10  an individual with Plaintiff's age, education, work history, and RFC could perform other jobs that
11  exist in significant numbers in the national economy. (AR 56-57.) The VE testified that the
12  individual could perform the job of patient transporter, DOT # 355.677-014, medium, SVP 2, and
13  54,335 jobs nationally. (AR 57.) The VE also testified that the individual could perform the job
14  of stubber, DOT # 222.687-034, medium, SVP 2, and 34,675 jobs nationally.[3] (AR 57.) Therefore,
15  the patient transporter and stubber jobs identified by the VE and incorporated by the ALJ into his
16  decision exist in significant numbers in the national economy.

17  Defendant correctly asserts that Plaintiff does not challenge the ALJ's step five finding that
18  he could perform other work for purposes of the Title XVI claim. In his reply, Plaintiff's only
19  assertion regarding the step five finding is that it rests on the correctness of the RFC assessment.
20  As discussed above, the Court finds that the ALJ did not err in giving no weight to Dr. Madrigal's
21  opinion. The Court also finds that the RFC is supported by substantial evidence. Therefore, the
22  Court finds that to the extent that the ALJ erred in his step four finding that Plaintiff could perform
23  his past relevant work as a truck dispatcher for the Title XVI claim, the error is harmless because
24  of the alternative step five finding that Plaintiff could perform jobs that exist in significant numbers
25  nationally.

---

[3] While the VE did not specifically state that 34,675 jobs are available nationally instead of regionally, based on the context of her responses, it appears that she meant nationally. If the VE meant regionally, it would still be a significant number of jobs. See Gutierrez, 740 F.3d at 528.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in giving little weight to Dr. Madrigal's opinion. The Court also finds that substantial evidence supports the RFC determination. To the extent that the ALJ erred in finding that Plaintiff could perform his past relevant work as a truck dispatcher on the Title XVI claim, the error is harmless because of the alternative step five finding.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff John Keith Walters. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **May 11, 2018**

UNITED STATES MAGISTRATE JUDGE